1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JIMMY LEE JONES,                              No.  2:12-cv-3015 KJM CKD P

12                  Petitioner,

13          v.                                      FINDINGS AND RECOMMENDATIONS

14    M.D. BITER,

15                  Respondent.

16

17

18          Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas

19    corpus under 28 U.S.C. § 2254.  He is serving a sentence of 40-years-to-life imprisonment

20    following convictions in Sacramento County for assault with a firearm on a minor, shooting at an

21    unoccupied vehicle, and unlawful possession of a firearm; the jury also found that the assault was

22    committed for the benefit or in association with the Del Paso Heights Bloods ("DPHB"), a

23    criminal street gang.  Petitioner challenges his conviction and sentence for the assault offense,

24    arguing gang-related evidence was improperly admitted in his trial, insufficient evidence

25    supported the jury's verdict that the assault was not committed lawfully in self-defense and that

26    the assault was committed in furtherance of a criminal street gang, and that the jury was

27    improperly instructed.  Upon careful consideration of the record and the applicable law, the

28    undersigned will recommend that federal habeas corpus relief be denied.

1

I.   Background

This case concerns a violent shootout between petitioner and another man on a residential street in the Del Paso Heights neighborhood of Sacramento in which a bystander was struck and grievously injured.  The dispute that prompted the shootout arose from an argument between a woman, Keeburee, and her boyfriend, Baby J.[1]  Like many star-crossed lovers before them, the record indicates that Keeburee and Baby J associated with members of rival street gangs—the "Oak Park Bloods" and "the Flats" sect of DPHB—and their romantic quarrel spilled over into a violent altercation in the streets, giving rise to the events underlying petitioner's conviction and his pending application for federal habeas relief.

A.   Factual Background

On February 17, 2007, Keeburee and her friends, Andrelia and Raukiya, were visiting Baby J at his house in an area of Del Paso Heights known as "the Flats."  After an argument with Baby J, Keeburee left his house upset, and as she walked down the street and around the corner, she called Baby J a "bitch."  Little did she know, her insulting remark was uttered within earshot of Baby J's associates—including petitioner—who were out front of a house about a block away.

After an exchange of verbal unpleasantries, Keeburee phoned her three older brothers who soon arrived to defend their sister, assisted by a friend, Rayshawn Smith.  Keeburee's brother Anthony then initiated a fist fight with one of the men from the porch, O'Neil.  The Court of Appeal summarized the ensuing altercation as follows:

> Anthony quickly overpowered O'Neil.  While Anthony had O'Neil on the ground, Anthony said, "Nigga, this is Oak Park.  This is Zilla."  "Zilla" is a street gang from Oak Park that has "clicked" up with the Oak Park Bloods, meaning the two gangs "work together" and have "become almost the same gang."  Anthony told O'Neil to say that "Zilla whipped [his] ass" and that Keeburee was "the best."  O'Neil said Keeburee was the best but refused to say anything about Oak Park or Zilla.  After he was through with O'Neil, Anthony began calling out his gang, yelling, "[T]his is Oak Park. This is Zilla.  Whoop de whoop.  Fuck the Flats. . . .  All y'all

---

[1] The factual background that follows is drawn from the California Court of Appeal for the Third District's unpublished opinion in People v. Deloney, No. C060503, 2011 WL 3423337 (Cal. Ct. App. Aug. 4, 2011) (unpublished).  (See also Pet. for Writ of Habeas Corpus, ECF No. 1, at 20 ("THE FACTS stated in the opinion of the court of appeal are generally sufficient for rendering a decision on this petition . . . .").)

2

1    can get it."

2  Deloney, 2011 WL 3423337, at *2 (alteration original).  In response to Keeburee's brother

3  Anthony's inflammatory remarks about "the Flats," petitioner responded in kind: "Nah, nigga.

4  Fuck Oak Park.  This is the Flats."  Id.  At which point, Keeburee's other brother, Malcolm, got in

5  petitioner's face and said, "'This is Oak Park.'  [Petitioner] responded, "I don't give a fuck.  You

6  feel me?  It's still the Flats.  You feel me, nigga.  You feel me?'  Malcolm said, 'Nigga, I'll beat

7  all y'all asses . . . .'"  Id.

8           At this point, Keeburee and the rest of the "Oak Park" group turned and began walking

9  away toward their cars.  As one of the members of the group, Rayshawn Smith, walked away, he

10  lifted his shirt to reveal a gun in his waistband or pocket and said, "All y'all some bitches, whoop

11  de whoop.  All y'all can get it.  I'll kill all y'all niggas, whoop de whoop.  Don't none y'all niggas

12  want it, woo woo."  Id. at *3.  At this point, most of the "Oak Park" group had gotten into their

13  cars, but Keeburee and Rayshawn Smith lingered behind arguing with petitioner and his "crew."

14           Petitioner was then handed a gun by one of the members of his crew.  Petitioner then

15  walked into the middle of the street and announced:  "'You think you're the only one with blaps

16  things.'  'Blaps' is a slang term used by [the criminal street gang known as the] Bloods to refer to

17  guns.  At that point, Andrelia and Raukiya ducked behind a truck."  Id.

18           Petitioner and Rayshawn Smith then fired their guns at each other.  The record is unclear

19  as to which of the two men fired first; however, it is clear that each man fired at least one shot.  A

20  bullet struck Andrelia—Keeburee's 15-year-old female friend—in the side and left her paralyzed

21  from the waist down.  Petitioner was observed firing his gun in the direction of the truck Andrelia

22  was hiding behind.

23           After the shooting, petitioner got into a van with his associates and drove off, and the

24  "Oak Park" group drove out of the neighborhood, leaving the injured Ardelia behind.  Petitioner

25  was wearing a red shirt at the time of the shooting.

26    B.  Expert Testimony at Trial

27           The trial court admitted over objection the testimony of Officer Robert Quinn, a detective

28  in the gang unit of the Sacramento Police Department and the lead investigator in the case.  The

1    Court of Appeal summarized his qualifications as an expert and his testimony as follows:

2
3          Officer Robert Quinn . . . testified as an expert in African American gangs, specifically the DPHB. His specialty within the gang unit is African American gangs in north Sacramento, including the DPHB. Over the years, he has had contact with members of the DPHB at least 100 times and is familiar with their territory, subsets, symbols, hand signs, tattoos, color, members, and crimes. According to Quinn, the DPHB operate mainly in the Del Paso Heights neighborhood in north Sacramento. The DPHB have numerous subsets, including Elm Street, the Dark Side, and the Flats. The subsets operate in smaller geographic areas within Del Paso Heights. While the DPHB's main rivals are "[a]ny and all Crip sets in Sacramento," they also feud with other Blood sets, including the Oak Park Bloods. The primary activities of the DPHB street gang are murder, attempted murder, assault with a deadly weapon, narcotic sales, robbery, burglary, and auto theft. Quinn testified at trial regarding past felony convictions of members of the DPHB.

4
5
6
7
8
9
10

11         Gang members like to broadcast their gang affiliation to other gang members. They do this through words, hand signs, tattoos, and wearing particular colors. Bloods are associated with the color red. According to Quinn, "[i]n the gang culture, respect is almost more powerful than money . . . ." Respect is obtained through fear, intimidation, and the commission of crimes. In gang culture, you lose respect if you are "disrespected" and fail to respond. If a gang member is challenged by a rival gang member and backs down, the gang member loses respect. To retain the respect of other gang members, a gang member must respond to a challenge by meeting the challenge and then taking it to the "next level." For example, "[w]hen another gang [member] ... yells out in your turf and yells out their gang to you and you don't meet that, then your gang as a whole loses respect as well as you amongst that gang." Likewise, "if that rival gang ... come[s] into your territory, [and] starts showing off a weapon," "[y]ou would lose respect if you didn't at least meet it or take it to the next level."

12
13
14
15
16
17
18
19

20       . . . .

21         Quinn . . . opined that [petitioner] was an active member of the DPHB street gang at the time of the shooting based on his prior arrest for selling marijuana; his membership in the Flats; his association with validated members of the DPHB; and his wearing of the color red. Like [petitioner's co-defendant] Deloney, [petitioner] was seen in the company of validated members of the DPHB before and after the shooting. In August and September 2006, he was seen in the company of Christopher Blundt, a validated member of the DPHB and the Flats. In September 2006, he was seen in the company of Tony Armstrong and Ronny Jones, validated members of the DPHB and the Flats. Moreover, at the time of the shooting and at the time of his arrest a month later, [petitioner] was wearing a solid red t-shirt. In addition, just before the shooting, he used the term "blap," a slang term used by Bloods to refer to a gun.

22
23
24
25
26
27
28

4

1

2

3

4

5

> Finally, Quinn opined that the shooting was gang-related and committed in association with and for the benefit of the DPHB street gang.  In support of his opinion, Quinn cited [petitioner's] membership in the Flats, which is "known as a Blood gang subset of the Del Paso Heights Bloods," [petitioner's] statement, "Fuck Oak Park, this is the Flats," and [petitioner's] wearing of the color red.

6

Deloney, 2011 WL 3423337, at *3-4 (emphasis added).

7

II.  Standard for Habeas Corpus Relief

8

An application for a writ of habeas corpus by a person in custody under a judgment of a

9

state court can be granted only for violations of the Constitution or laws of the United States.  28

10

U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any claim decided on the

11

merits in state court proceedings unless the state court's adjudication of the claim:

12

13

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

14

15

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)").[1]  It is the habeas petitioner's burden to

17

show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S.

18

19, 25 (2002).

19

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are different.

20

As the Supreme Court has explained:

21

22

23

24

25

26

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor,

27

28

---

[1]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for entitlement to habeas relief.  Fry v. Pliler, 551 U.S. 112, 119 (2007).

1

2

> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

3  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law

4  set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to

5  cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

6        The court will look to the last reasoned state court decision in determining whether the

7  law applied to a particular claim by the state courts was contrary to the law set forth in the cases

8  of the United States Supreme Court or whether an unreasonable application of such law has

9  occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

10        When a state court rejects a federal claim without addressing the claim, a federal court

11  presumes the claim was adjudicated on the merits, in which case § 2254(d) deference is

12  applicable.  Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).  This presumption can be

13  rebutted.  Id.

14        It is appropriate to look to lower federal court decisions to determine what law has been

15  "clearly established" by the Supreme Court and the reasonableness of a particular application of

16  that law.  "Clearly established" federal law is that which has been determined by the Supreme

17  Court.  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is

18  appropriate to look to lower federal court decisions as persuasive authority in determining what

19  law has been "clearly established" and the reasonableness of a particular application of that law.

20  Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th

21  Cir. 2003), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003); cf.

22  Arredondo, 365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside

23  bounds of Supreme Court precedent is misplaced).

24        The four claims presented in this action were presented on direct appeal.  The California

25  Court of Appeal issued a reasoned decision with respect to both of petitioner's claims.  The

26  claims were presented to the California Supreme Court via a "petition for review."  These claims

27  were denied without comment.

28  ////

1  III. <u>Arguments and Analysis</u>

2     A. <u>Petitioner's Claim that Det. Quinn's Gang-Affiliation Opinion Was Improperly Admitted</u>

3        Petitioner claims the trial court erred in admitting over objection, and the appellate court

4  erred by affirming this decision, Detective Quinn's testimony concerning petitioner's gang

5  affiliation.  (Pet. for Writ of Habeas Corpus 36.)  Respondent counters arguing *inter alia* "federal

6  habeas relief is unavailable in matters where there is no clearly established Supreme Court

7  precedent in support of the petitioner's claim."  (Answer to Pet. for Writ of Habeas Corpus 28:18-

8  29:13, ECF No. 13 (citing <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009)).)

9        "Under AEDPA [the Antiterrorism and Effective Death Penalty Act], even clearly

10  erroneous admissions of evidence that render a trial fundamentally unfair may not permit the

11  grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid

12  out by the Supreme Court."  <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009).  In

13  <u>Estelle v. McGuire</u>, the Supreme Court "express[ed] no opinion on whether a state . . . would

14  violate the Due Process Clause" if the state court erroneously admitted prejudicial evidence "to

15  show propensity to commit a charged crime."  502 U.S. 62, 75 n.5 (1991).  Accordingly, the

16  Ninth Circuit has held that the Supreme Court "has not yet made a clear ruling that admission of

17  irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

18  issuance of the writ."  <u>Holley</u>, 568 F.3d at 1101.

19        Here, petitioner does not direct the court to a Supreme Court decision, and this court is

20  aware of none, holding that a state court's admission of expert testimony concerning a

21  defendant's gang affiliation constitutes a due process violation sufficient to warrant federal

22  habeas relief.  "Absent such 'clearly established Federal law,'" the undersigned "cannot conclude

23  that the state court's ruling was an 'unreasonable application.'"  <u>Id.</u> (quoting <u>Carey v. Musladin</u>,

24  549 U.S. 70, 77 2006)).

25        Accordingly, petitioner's evidentiary claim does not warrant federal habeas relief.

26     B. <u>Petitioner's Insufficient Evidence to Support the Jury's Verdict Claims</u>

27        Petitioner's defense in his trial was that he fired his gun in self-defense.  Petitioner also

28  opposed the gang enhancement, arguing the assault was not committed in furtherance of gang

1    activities, but arose from a personal dispute between Keeburee and Baby J.  In his pending

2    application for federal habeas relief, petitioner in essence claims insufficient evidence supports

3    the jury's findings (1) that petitioner was not acting in lawful self-defense and (2) that petitioner

4    was acting in furtherance of gang activities.  These claims, and the applicable standard, are

5    discussed in turn below.

6            1.   Applicable Standard

7            The Fourteenth Amendment prescribes: "No state shall . . . deprive any person of life,

8    liberty, or property, without due process of law."  U.S. CONST. amend XIV, § 1.  As such, "the

9    Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon

10   proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

11   charged.'"  Jackson v. Virginia, 443 U.S. 307, 315 (1979) (quoting In re Winship, 397 U.S. 358,

12   364 (1970)).  Accordingly, "[a] federal court has a duty to assess the historic facts when it is

13   called upon to apply a constitutional standard to a conviction obtained in a state court."  Id. at

14   318.  "[R]eview of the constitutional sufficiency of evidence to support a criminal conviction"

15   requires a reviewing court to conduct a "two-step inquiry": "First, a reviewing court must

16   consider the evidence presented at trial in the light most favorable to the prosecution."  United

17   States v. Nevils, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc).  "Second, after viewing the

18   evidence in the light most favorable to the prosecution, the reviewing court must determine

19   whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the

20   essential elements of the crime beyond a reasonable doubt.'"  Id. at 1164 (quoting Jackson, 443

21   U.S. at 319).

22           In the federal habeas context, "a federal court may not overturn a state court decision

23   rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with

24   the state court.  The federal court instead may do so only if the state court decision was

25   'objectively unreasonable.'"  Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam).  "Thus, when

26   [a federal court] assess[es] a sufficiency of evidence challenge in the case of a state prisoner

27   seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of

28   deference that can rarely be surmounted."  Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011),

1    cert. denied, 132 S. Ct. 2723 (2012).  "The Jackson v. Virginia standard is itself deferential," and

2    "AEDPA adds a second level of deference . . . ."  Id.

3          2.  Self-Defense

4          As previously mentioned, petitioner in essence challenges his continuing imprisonment

5    arguing the jury's finding—that he did not act in self-defense—was not supported by the

6    evidence in violation of his constitutional right to due process.  "In determining whether a state

7    court decision is contrary to federal law, we look to the state's last reasoned decision . . . ."

8    Avila, 297 F.3d at 918.  Accordingly, the court turns now to the California Court of Appeal's

9    decision on direct appeal rejecting petitioner's insufficient evidence claim:

10               Viewed in the light most favorable to the judgment, the
        evidence showed that Deloney did not obtain and [petitioner] did
11       not display the gun until after members of the Oak Park group were
        walking toward their cars and members of defendants' crew had
12       arrived on the scene.  Moreover, [petitioner] did not immediately
        start shooting once he obtained the gun.  Rather, he walked into the
13       street and toward the Oak Park group with the gun and announced,
        "You think you're the only one with blaps things."  It was only
14       after [petitioner] displayed his gun and made that comment that
        Smith removed his gun from his waistband.  Furthermore, when a
15       gang member is challenged by a rival gang member, the challenged
        gang member must respond by meeting the challenge or taking it to
16       the next level in order to retain the respect of other gang members.
        This is especially true where, as here, a rival gang comes into
17       another gang's territory, yells out their gang, and shows off a
        weapon.
18
19               On this record, a juror reasonably could conclude that
        [petitioner] did not actually believe he or Deloney was in imminent
20       danger of being killed or suffering great bodily injury when he
        walked into the street with the gun; but rather, was responding to a
21       challenge by a rival gang in an attempt to retain his respect.  As
        discussed in part III, supra, there is substantial evidence defendants
22       committed counts 1 and 2 for the benefit of or in association with
        the DPHB.
23
               Defendants argue that even if the right to self-defense did
24       not attach at that point, it most certainly did once defendants were
        being fired upon.  According to defendants, "It is inconceivable that
25       [petitioner] did not believe he was in grave peril while he stood in
        the street watching an adversary firing in his direction."
26
               "'The right of self-defense is not available to a person who
27       seeks a quarrel with the intent to create a real or apparent necessity
        of exercising self-defense.'"  (People v. Olguin (1994) 31 Cal. App.
28       4th 1355, 1381, fn. 10.)  In other words, if [petitioner] provoked
        members of the Oak Park group with the intent of creating an

                                            9

excuse to shoot, he had no right to self-defense.  As the People point out, "the evidence indicated that [defendants] made several statements and engaged in actions that the jury could reasonably have interpreted as 'provok[ing] a fight or quarrel with the intent to create an excuse to use force.'"  Significantly, the Oak Park group was in the process of leaving when [petitioner] walked into the street, displayed a gun, and yelled, "You think you're the only one with blaps things?"  Smith, who had a gun in his waistband and was continuing to argue with [petitioner], was walking backward toward the cars.  Smith did not remove his gun until after [petitioner] walked into the middle of the street, displayed his gun, and announced that Smith was not the only one with a gun. On this record, a juror reasonably could conclude that [petitioner], by his actions, intended to provoke a gunfight.  Accordingly, sufficient evidence supports a finding that [petitioner] did not have a right to self-defense even after Smith and other members of the Oak Park group began shooting.

Deloney, 2011 WL 3423337, at *5-6.

Review of the record in this case confirms that the Court of Appeal's decision was not an "unreasonable application" of "clearly established federal law."  28 U.S.C. § 2254(d)(1). Although Smith displayed the gun in his waistband first, when viewed "in in the light most favorable to the prosecution,"  Nevils, 598 F.3d at 1163, the jury could have reasonably concluded that petitioner  did not actually believe that he was in imminent danger, but was instead responding to a gang-related show of force.  Moreover, the court notes the prolonged time delay between Smith's display of his gun in his waistband, and petitioner obtaining a gun from his associate to then display and eventually fire.  Considered in the context of petitioner's statements—"You think you're the only one with blaps things?"—the jury could have reasonably concluded petitioner did not actually believe he was in danger.

Accordingly, the Court of Appeal's decision—rejecting petitioner's self-defense sufficiency of the evidence claim—was not "objectively unreasonable," and the undersigned will recommend that this portion of petitioner's application for habeas relief be denied.

3.   Gang Enhancement

Petitioner also challenges the sufficiency of the evidence supporting the jury's finding that the assault was committed for the benefit of or in association with DPHB, a criminal street gang. In the last reasoned decision, the California Court of Appeal considered and rejected this claim:

During the dispute, [petitioner] repeatedly announced, "This

10

1   is the Flats" in response to Anthony and Malcolm calling out their
2   gang, Oak Park.  Contrary to [petitioner's] assertion [that Quinn's
    opinion is not supported], Quinn did state a basis for his opinion
3   that the Flats is a subset of DPHB.  He specified that his opinion
    was "based on [his] experience and [his] contacts with gang
4   members and nongang members in the street . . . ."  He then
    explained that "the Flats are known as a Blood gang subset of the
5   Del Paso Heights Bloods.  You ask people who are part of that and
    they'll tell you that.  People who are not a part of that [who] live in
6   the neighborhood . . . explained to me that [the Flats is] a Blood
    gang, part of [the] DPH[B]."  He also noted that graffiti found in
7   the Flats "lets people know that this is DPH[B] and a Blood
    territory, and then you see Flats on the street."

8            . . . .

9            Here, the evidence established the Flats and the DPHB were
    part of the same overall organization.  Quinn explained that the
10  Bloods are the "overall umbrella" under which subsets for "major
    geographical location[s]," such as the DPHB and the Oak Park
11  Bloods, operate.  The DPHB primarily operates in the Del Paso
    Heights neighborhood in north Sacramento.  It, in turn, is
12  comprised of numerous subsets, such as Elm Street, the Dark Side,
    Trigger Mob, and the Flats, which claim different streets or smaller
13  geographical areas within Del Paso Heights.  Moreover, evidence
    that defendants were observed before and after the shooting in the
14  company of men who were validated members of the Flats and
    DPHB suggested the Flats and the DPHB were engaged in
15  collaborative activities.  In sum, the jury's findings that defendants
    committed the offenses for the benefit of or in association with the
16  DPHB is supported by substantial evidence.

17  Deloney, 2011 WL 3423337, at *10-11.

18       Review of the record in this case confirms that the Court of Appeal's decision was not an

19  "unreasonable application" of "clearly established federal law."  28 U.S.C. § 2254(d)(1).

20  Petitioner's repeated statements throughout the altercation concerning his affiliation with "the

21  Flats" (a subset of DPHB), his red attire, and his association with confirmed members of

22  DPHB—together with the testimony of Officer Quinn—support the jury's conclusion that

23  petitioner was a member of the Flats, a subset of DPHB, and that he committed the assault to

24  respond to a member of a rival gang.  In other words, a "rational trier of fact" could have found

25  that petitioner committed the crime for the benefit of or in association with DPHB, a criminal

26  street gang, "beyond a reasonable doubt.'"  Nevils, 598 F.3d at 1164.

27       Accordingly, the Court of Appeal's decision rejecting petitioner's sufficiency of the

28  evidence claim was not "objectively unreasonable," and the undersigned will recommend that this

11

1    portion of petitioner's application for habeas relief be denied.

2        C.  Petitioner's Jury Instruction and Closing Argument Claim

3            Petitioner contends the trial court improperly instructed the jury on mutual combat, and

4    abused its discretion by denying his request to reopen closing argument to address this issue.  In

5    the last reasoned decision, the Court of Appeal considered and rejected these claims as well:

6                         **A. Definition of Mutual Combat**

7                    The jury was initially instructed in the language of
     CALCRIM No. 3471 (Right to Self Defense: Mutual Combat or
8    Initial Aggressor) as follows: "A person who engages in mutual
     combat or who is the initial aggressor has a right to self-defense
9    only if, one, he actually [and] in good faith tries to stop fighting;
     two, he indicates by words or conduct to his opponent in a way that
10   a reasonable person would understand that he wants to stop fighting
     and that he has stopped fighting; and three, he gives his opponent a
11   chance to stop fighting. If a person meets these requirements, he
     then has a right to self-defense if the opponent continues to fight.
12   [¶] If you decide that the defendant started the fight using
     nondeadly force and the opponent responded with such sudden and
13   deadly force that the defendant could not withdraw from the fight,
     then the defendant had the right to defend himself with deadly force
14   and was not required to try to stop fighting."

15                   On the second day of deliberations, [petitioner's] jury
     requested "a more detailed definition of [m]utual [c]ombat." The
16   court responded by providing the following written definition: "1.
     'Mutual combat ' means not merely a reciprocal exchange of
17   hostilities, but hostilities pursuant to prearrangement, mutual
     consent, or mutual intention, either express or implied, preceding
18   the initiation of the hostilities. In other words, it is not merely the
     combat, but the preexisting intention to engage in it that must be
19   mutual.  The preexisting intention can occur over a period of time
     or it may occur in a brief interval.  The test is not time, but
20   reflection.'" At defendants' request, the court also included the
     following "clarif[ication of] [a] possible ambiguity in Jury
21   Instruction [No.] 3471. Right of Self–Defense: Mutual Combat or
     Initial Aggressor": "If you decide the parties had a preexisting
22   intention or agreement to engage in mutual combat, you must then
     decide what that intention contemplated. [¶] If you find that the
23   intention to engage in mutual combat only contemplated the use of
     non-deadly force by both parties, and the opponent responded with
24   such sudden and deadly force that the defendant could not withdraw
     from the combat, then the defendant had the right to defend himself
25   with deadly force and was not required to try to stop fighting. [¶] If
     you find that the intention to engage in mutual combat
26   contemplated the use of deadly force by both parties, then a person
     has a right of self-defense only if they follow steps 1 through 3 of
27   Jury Instruction [No.] 3471."

28                   [Petitioner] complains that the trial court's use of the term

                                    12

"hostilities," rather than "blows" or "fight" in its definition of "mutual combat" was misleading because "[i]t easily leaves open the possibility [that] verbal hostilities" can constitute combat. [Petitioner] also asserts that the court's use of the word "intention," rather than "agreement" in its definition of "mutual combat" was misleading because "[i]t is easily possible for one of the parties to intend to engage in combat while the other does not," which is not "mutual combat." We are not persuaded by either claim.

[Petitioner's] arguments fail to consider the court's instructions in their entirety. While the first sentence of the court's definition uses the term "hostilities," the next sentence discusses combat and makes plain that verbal sparring does not amount to mutual combat. Moreover, CALCRIM No. 3471, on which the jury was instructed, repeatedly uses the terms "fight" and "fighting" in discussing mutual combat, and the clarifying instruction given by the court makes plain that combat necessarily involves the use of force. On this record, no reasonable jury would have concluded that verbal hostilities constitute mutual combat.

It is also clear that the "preexisting intent" referenced in the court's definition must be mutual. Indeed, the court's definition of mutual combat explicitly states that "it is not merely the combat, but the preexisting intention to engage in it that must be mutual." (Underlining added.) In other words, the parties must have agreed to engage in combat. No reasonable juror would have concluded from the court's instruction that the intent to engage in mutual combat could be one-sided.

### B. Refusal to Reopen Closing Argument

[Petitioner] also contends the trial court abused its discretion in refusing his request to reopen closing argument on the issue of mutual combat. We disagree.

Once the court settled on its response to the jury's question, [petitioner], through his counsel, sought to reopen closing argument to discuss the definition of mutual combat and to argue that [petitioner] did not agree to engage in mutual combat, was prevented from withdrawing from any agreed-upon combat by Smith's escalation of force, and was merely reacting to Smith's escalation of force. The court denied his request, finding its provision of a legal definition of mutual combat did not warrant the reopening of argument, and in any event, [petitioner] had previously argued the points he sought to raise if closing argument was reopened.

While the court had the discretion to reopen closing argument, it did not abuse its discretion in refusing to do so here. (See People v. Young (2007) 156 Cal.App.4th 1165, 1171–1172.) In Young, the jury advised the court that it was deadlocked and that "it was unclear whether 'there's 100 percent understanding from everyone in the box ... how the lesser charges work with the robbery.'" (Id. at p. 1170.) The court referred the jury to the instructions, and the foreperson responded that "the problem

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

appeared to be a disagreement on 'the perception of the facts' and [he] did not believe any additional time would be helpful in reaching a verdict." (Ibid.) The rest of the jury agreed that neither additional time nor instruction would be helpful. (Ibid.) The court asked whether further argument from the attorneys might be helpful, and some of the jurors indicated that it would be. (Ibid.) Accordingly, the court reopened closing argument for both parties. (Ibid.) In determining that the trial court acted within its inherent authority and did not abuse its discretion, we explained, "There is authority guiding the trial court's actions with respect to the order of a jury trial and its obligations upon being faced with a deadlocked jury. Section 1093 delineates the order that trial procedures shall follow, including the direction that the prosecutor and defense counsel may argue the case to the court and jury upon the close of evidence. (§ 1093, subd .(e).) Section 1094 grants the trial court broad discretion to depart from the order specified in section 1093. Section 1140 entitles the trial court to ascertain whether there is a reasonable probability a jury deadlock might be broken. [Citations.] When the court is faced with a deadlocked jury, it must proceed carefully, lest its actions be viewed as coercive. [Citation.] At the same time, when faced with questions from the jury, including that they have reached an impasse, 'a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least consider how it can best aid the jury.' [Citation.]" (Id. at pp. 1171–1172, fn. omitted.) "By asking if additional argument might be helpful, the court did no more than ascertain the reasonable probability of the deadlock being broken and a means by which that might be accomplished. When some of the jurors agreed additional argument might help them in reaching a verdict, it was not inappropriate for the court to seek to offer that alternative to aid the jury." (Id. at p. 1172.)

17
18
19
20
21
22
23
24

Conversely, here, the jury did not advise the court that it was deadlocked. Moreover, the jury's question indicated that it needed additional guidance on the law, not that there was disagreement on the facts or the law's application thereto. It cannot seriously be disputed that it is for the trial court, not counsel, to instruct the jury as to questions of law. (People v. Baldwin (1954) 42 Cal.2d 858, 871.) The court did so here, and as previously discussed, we reject [petitioner's] assertion that the court's response to the jury's question was misleading. Moreover, as the trial court found, [petitioner] had already argued that he was not involved in mutual combat, but rather "resisted" it, and that "words are not engaging in [mutual] combat." [Petitioner] also noted that Smith had a gun out and was waiving it in the air before he ever had a gun. Accordingly, there was no abuse of discretion.

25   Deloney, 2011 WL 3423337, at *7-10.

26   Although a complete denial of a closing argument violates a criminal defendant's

27   constitutional rights, the "presiding judge . . . is given great latitude in controlling the duration

28   and limiting the scope of closing summations. He may limit counsel to a reasonable time and

1    may terminate argument when continuation would be repetitive or redundant." Herring v. New

2    York, 422 U.S. 853, 862 (1975).

3           Similarly, federal habeas petitioners must meet a high threshold to obtain relief based on

4    an asserted error in instructing the jury.  The petitioner must show not only an erroneous

5    instruction, but also that "the ailing instruction by itself so infected the entire trial that the

6    resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973).

7           In this case, petitioner in essence contends the jury instruction on mutual combat was

8    incorrect as a matter of state law; however, "federal habeas corpus relief does not lie for errors of

9    state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991).  Moreover, the jury instruction does not

10   appear to violate any federal constitutional safeguard.  The jury instruction did not disregard the

11   principle that guilt "must be proved beyond a reasonable doubt," In re Winship, 397 U.S. at 368,

12   nor "'shift' the prosecution's burden of proof," Cupp, 414 U.S. at 145.  Further, in Herring, the

13   Supreme Court established that the trial judge has "great latitude in controlling" closing

14   arguments.  422 U.S. at 862.  The Court of Appeal found no abuse of discretion in declining

15   petitioner's request to reopen closing argument, and neither does this court.  In short, "[p]etitioner

16   has not demonstrated how the trial court's restriction on the defense closing summation was

17   contrary to or an unreasonable application of the principle set forth in Herring." Vue v.

18   Harrington, No. 2:09-cv-1340 JAM, 2011 WL 2198530, at *11 (E.D. Cal. June 6, 2011).

19   IV. Conclusion

20          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

21   habeas corpus be DENIED.

22          These findings and recommendations are submitted to the United States District Judge

23   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

24   after being served with these findings and recommendations, any party may file written

25   objections with the court and serve a copy on all parties.  Such a document should be captioned

26   "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

27   may address whether a certificate of appealability should issue in the event he files an appeal of

28   the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

1    court must issue or deny a certificate of appealability when it enters a final order adverse to the

2    applicant).  Any reply to the objections shall be served and filed within fourteen days after service

3    of the objections.  The parties are advised that failure to file objections within the specified time

4    may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

5    Cir. 1991).

6    Dated:  September 26, 2013

7                                                                      _____

8                                                                      CAROLYN K. DELANEY
                                                                       UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28